In The
Court of Appeals
For The
First District of Texas




NO. 01-07-00762-CV




SCTW HEALTH CARE CENTER, INC., STAN STEELE, WYNELL SUITT
AND WTCS HEALTH CARE CENTER, INC., Appellants

V.

AAR INCORPORATED, ST. PAUL FIRE & MARINE INSURANCE
COMPANY, AND ST. PAUL MERCURY INSURANCE COMPANY,
Appellees



   
On Appeal from the 212th District Court
Galveston County, Texas
Trial Court Cause No. 05-CV-1448




MEMORANDUM OPINION 
             Appellants, SCTW Health Care Center, Inc., Stan Steele, Wynell Suitt and
WTCS Health Care Center, Inc., (collectively “SCTW”), were sued by AAR,
Incorporated (“AAR”) for failing to pay for mold remediation and storage services
that AAR had provided. After a trial by jury, the trial court awarded AAR
$422,049.05 in damages, pre-judgment interest and attorney’s fees. SCTW contends
the trial court erred by (1) failing to exclude expert testimony regarding AAR’s
damages; (2) striking SCTW’s cross-claim against its insurers prior to trial; and (3)
in spite of legally and factually insufficient evidence, rendering judgment in AAR’s
favor on its claims of breach of contract, quantum meruit, fraud, fraudulent transfer
of assets, civil conspiracy, and breach of a contract to which AAR was a third party
beneficiary; and (4) in awarding AAR its attorney’s fees. We affirm.
FACTUAL BACKGROUND
SCTW owns and operates a nursing home facility, Bayou Pines, in La Marque,
Texas. Bayou Pines apparently sustained significant mold damage, for which SCTW
sued its various contractors and architects in 2001. St. Paul Mercury Insurance
Company (individually and collectively with its affiliate St. Paul Liability and
Casualty Insurance Company, “St. Paul”), SCTW’s insurer, ultimately paid SCTW
$3,405,611.93 for damages and expenses SCTW incurred in dealing with the mold
and remediation of its facility, and St. Paul also intervened in SCTW’s lawsuit against
its contractors to protect its subrogation interests. 
AAR performs mold remediation and related services at Bayou Pines
          While SCTW’s lawsuit against its contractors and architects was pending, St.
Paul recommended, and SCTW hired, AAR to perform various mold remediation
services at Bayou Pines. These services included overseeing the collection,
remediation and storage of the residents’ belongings. SCTW signed two written
contracts accepting AAR’s proposals to provide mold remediation services. The first,
dated November 7, 2003, provides
This Letter of Contract will confirm S.C.T.W. Health Care’s acceptance
of your proposal to perform work based upon the Unit Rate Sheet which
is attached and made a part of this contract for:
 
Clean-up, Transportation, Storage and Disposal of Misc. Mold impacted
building materials and furnishings at the above referenced location, as
outlined in the Remediation Plan S.C.T.W. Bayou Pines, prepared by
Unified Building Sciences & Engineering, Inc. and dated September 03,
2003.
 
. . . .
 
All proceeds received from St. Paul Property and Liability Insurance
Company pertaining to the work which AAR, Inc. performs will become
payable to AAR, Inc. upon receipt. . . . Upon acceptance of each
segment of the work, Stan Steele will promptly process your payment.
 
 
The second contract, dated March 3, 2004, was similar but related to

Mold remediation, including sheetrock, flooring, lighting, insulation, a/c
duct, plumbing and other items associated with the remediation of the
perimeter walls, bedroom ceilings, lights and other ceiling penetrations
as outlined in the Remediation Plan S.C.T.W. Bayou Pines, prepared by
Unified Building Sciences & Engineering Inc. and dated September 03,
2003.

Both of these contracts are in the form of a “Letter of Contract” and both documents
are on SCTW letterhead. 
          AAR began packing out, cleaning and storing materials and furnishings at
Bayou Pines in November 2003. In March 2004, AAR began tearing out and 
cleaning mold-impacted sheetrock, flooring, and other portions of the Bayou Pines
building. AAR completed this second phase of work in April 2004. SCTW was not
yet ready, however, to rebuild its facility at that time. Accordingly, AAR continued
to provide climate control in the Bayou Pines building until SCTW could re-build its
facility. AAR also continued to store SCTW’s furnishings.
AAR does not receive full payment for its services
          SCTW paid for a portion of AAR’s work by negotiating and delivering to AAR
two insurance checks made jointly payable to AAR and SCTW. The two joint checks
did not, however, pay for all of the services AAR had rendered. Specifically, AAR’s
fees for continuing building climate control services and storage of the furnishings
remained unpaid.
          Due to the continuing disagreement between SCTW and St. Paul regarding
SCTW’s insurance coverage, SCTW had not rebuilt the Bayou Pines facility as of the
end of September 2004. St. Paul stopped coverage under its policy for AAR’s
ongoing building climate control and storage services on October 1, 2004. St. Paul
also told SCTW it would pay no more money under the insurance policy. 
          By September 2004, AAR became impatient with the lack of payment on the
remaining sums due, and gave SCTW notice of its intent to file a lien. In late
September 2004—after SCTW had received its final payments from St. Paul—Stan
Steele, SCTW’s Vice President, met with AAR’s Dwain Bankston and Michael
Mackey to discuss AAR’s outstanding charges and continuing services. Despite
having been notified by St. Paul that no further proceeds would be paid under the
policy, and despite having received $240,000 from St. Paul to cover AAR’s amounts
due, Steele told AAR’s representatives that he was still having disputes with St. Paul
concerning what the insurance policy covered and that he believed St. Paul should
pay for AAR’s services. Steele offered to pay AAR $125,000 toward AAR’s
outstanding charges for building climate control and storage. The parties agreed on
an allocation of the $125,000 between the outstanding charges for storage and
building climate control, leaving an unpaid balance that Steele stated would be paid
by SCTW when it was successful in the Contractor Lawsuit. 
          During this meeting, Steele did not tell AAR’s representative that St. Paul had
just paid SCTW over $1.6 million, or that St. Paul’s allocation of funds paid to SCTW
included $240,000 to pay for AAR’s building climate control and storage services. 
Steele also never told AAR that SCTW and St. Paul had agreed that insurance
coverage for continued building climate control and storage services would end on
October 1, 2004. Instead, Steele requested that AAR continue to provide services and
also requested that it try to obtain reduced pricing. According to AAR’s
representatives, Steele also specifically promised to pay for ongoing building climate
control services and storage, even if St. Paul did not. 
SCTW and St. Paul enter into a Rule 11 Agreement in the Contractor Lawsuit
          On August 28, 2005, SCTW entered into a Rule 11 Agreement with St. Paul
in the Contractor Lawsuit. The Rule 11 Agreement contemplated a formal settlement
agreement, which was subsequently executed on August 30, 2005. As part of the
settlement agreement, St. Paul agreed to take no more than $1,000,000 of the
Contractor Lawsuit proceeds—significantly less than the amount St. Paul paid SCTW
on the Bayou Pines claim. In exchange, SCTW agreed, among other things, to release
St. Paul from any further obligations under the insurance policy. As part of the
settlement agreement, SCTW and St. Paul agreed that SCTW would “address any
claims of AAR/ServPro . . . .”  
AAR files suit against SCTW and St. Paul
          SCTW ultimately received $892,000 as a result of its lawsuit against the
architects and contractors. On October 26, 2005, following the successful conclusion
of SCTW’s lawsuit against these contractors, AAR demanded full payment of its
outstanding charges for building climate control and storage. SCTW refused to pay
the amounts demanded by AAR. Accordingly, on November 8, 2005, AAR filed the
lawsuit forming the basis of this appeal against SCTW and against Steele and his
sister Wynell Suitt, the President of SCTW. In addition, AAR filed suit against St.
Paul. 
          In its petition, AAR alleged claims for breach of contract, quantum
meruit/implied contract, fraud, negligent misrepresentation, misapplication of trust
funds, civil conspiracy, and tortious interference with contract related to mold
remediation, climate control, and contents storage services AAR provided to SCTW. 
SCTW filed a counterclaim against AAR for fraud, negligent misrepresentation, and
violations of the Texas Deceptive Trade Practices Act. 
SCTW transfers $500,000 to another corporate entity
          In 2006, after AAR filed its suit against SCTW, SCTW transferred over
$500,000—the amount remaining from its recovery in the Contractor Lawsuit—to
another corporate entity, WTCS. WTCS was the corporate entity running the new
facility to which displaced Bayou Pines residents had been transferred. Wynell Suitt
was also the President of WTCS. SCTW did not receive anything of value for the
transfer. In fact, SCTW’s sole asset identified at trial, other than the vacant Bayou
Pines building that had been gutted by mold remediation and which Wynell Suitt
described as “defunct,” was a unsecured note for $1,042.741.47 owed by WTCS to
SCTW (the “WTCS Note”). This WTCS Note had come due on December 31, 2004,
and still had not been paid at the time of trial. Wynell Suitt admitted at trial that
WTCS lacked the funds to pay the Note. 
          At the time SCTW transferred the money to WTCS, SCTW was in default on
a building loan. At the time of the underlying trial in April 2007, Wynell Suitt
testified that SCTW owed $43,000 per month on that loan and that no payments had
been made on that loan for three years. 
In the underlying lawsuit, both AAR and SCTW sought an interpretation of the
SCTW/St. Paul Rule 11 Agreement

          On March 16, 2007—the deadline for amending and supplementing
pleadings—AAR filed its Third Amended Original Petition, adding an allegation that
AAR was a third-party beneficiary of the Rule 11 settlement agreement between
SCTW and St. Paul in the prior Contractor Lawsuit and that SCTW breached that
agreement. On the same day, SCTW filed its Original Cross-Claim against St. Paul
seeking a declaratory judgment that its agreement in the Rule 11 to “address” the
amounts due AAR was ambiguous and could not be enforced.
          Shortly thereafter, St. Paul filed a motion to dismiss SCTW’s declaratory
judgment Cross-Claim, asserting that the Cross-Claim was improper because AAR
had already placed the settlement agreement at issue by pleading AAR was a third-party beneficiary of the settlement agreement which SCTW breached. St. Paul also
asserted that SCTW’s Cross-Claim should be dismissed because SCTW was merely
using the declaratory judgment to deny liability to AAR’s claims and to obtain
attorney’s fees. St. Paul further requested SCTW’s Cross-Claim be dismissed
because SCTW’s request that the trial court deem certain settlement agreement
language to be ambiguous and strike a complete sentence in its entirety from the
settlement agreement was not a proper remedy. 
          On the day of the oral hearing on St. Paul’s motion to dismiss, SCTW filed an
amended Cross-Claim asking the court to either invalidate the settlement language
or have the jury determine its meaning. After reviewing the evidence and hearing the
parties’ arguments, the trial court granted St. Paul’s motion to dismiss SCTW’s
Cross-Claim.
          Thereafter, prior to trial, AAR resolved its claims against St. Paul and filed a
motion to dismiss all claims against St. Paul with prejudice, which the trial court
granted. SCTW subsequently supplemented its answer to AAR’s claims, denying that
AAR was a third-party beneficiary of the SCTW/St. Paul settlement agreement and
complaining that the settlement agreement language was ambiguous.
 

The jury trial and final judgment in favor of AAR
          All remaining claims proceeded to trial on April 10, 2007, and the jury returned
a verdict in favor of AAR and against SCTW, Steele and Suitt on all submitted
questions. 
          The jury charge in this case was submitted with a damages question for each
theory of liability. The jury made the following findings: (1) SCTW and AAR agreed
for AAR to provide storage services or climate control services to SCTW; (2) SCTW
failed to comply with its agreement relating to AAR’s services; (3) AAR should be
awarded $290,211.01 for SCTW’s failure to comply with that agreement; (4) AAR
performed compensable work for SCTW; (5) AAR should be awarded $290,211.01 
for that compensable work; (6) SCTW, Steele and Suitt committed fraud against
AAR; (7) AAR should be awarded $168,000 for damages sustained as a result of that
fraud; (8) SCTW fraudulently transferred assets to WTCS; (9) SCTW transferred 
$550,000 to WTCS; (10) Steele and Suitt were part of a conspiracy to fraudulently
transfer SCTW’s assets, thus harming AAR; (11) SCTW failed to comply with its
settlement agreement with St. Paul; (12) AAR was a third party beneficiary to the
agreement between SCTW and St. Paul; (13) AAR should be awarded $290,211.01
for SCTW’s failure to comply with the settlement agreement; and (14) AAR should
be awarded $89,500 for its attorney’s fees for preparation and trial, $20,000 for
attorney’s fees in case of an appeal to the Court of Appeals, and $75,000 in attorney’s
fees in case of an appeal to the Supreme Court of Texas. 
          Although the jury had found in its favor on all of its submitted theories of
liability, AAR only moved for entry of judgment on the jury’s findings regarding
breach of contract, fraudulent conveyance and conspiracy to fraudulently convey
assets. The trial court granted the motion, awarding AAR actual damages in the
amount of $290,211.01, less $32,995.68 in settlement credits. The judgment also
awarded AAR pre-judgment interest and attorney’s fees through trial, plus post-judgment interest, costs, and attorney’s fees on appeal. 
ANALYSIS
I.       Did the trial court err by allowing AAR’s expert to testify regarding
damages? 

          In its first issue, SCTW complains that the trial court erred by (1) denying its
pre-trial motion to exclude expert testimony on AAR’s damages and (2) overruling
its trial objection to damages testimony from Dwain Bankston, whom AAR
designated as both a fact witness and an expert witness. At trial, Bankston testified
that the unpaid storage charges accrued from January 2004 to June 2006 and unpaid
climate control charges accrued from January 2004 through June 2005 amounted to
$290,211.01. 
          On appeal, SCTW contends that the trial court’s decision to allow Bankston to
testify regarding damages violates the Texas Rules of Civil Procedure because AAR
did not properly designate Bankston as an expert within the deadlines set by the
docket control order, and because AAR’s disclosures failed to adequately set forth
Bankston’s mental impressions and opinions, and the basis for those impressions and
opinions. Nor, argues SCTW, did AAR produce documentation that had been
reviewed by Bankston in reaching these opinions. SCTW, prior to trial, moved to
exclude Bankston on these grounds. The trial court overruled the motion without
specifying the reason for its decision. At trial, SCTW objected to Bankston offering
testimony that differed from AAR’s pre-trial disclosures, even though Bankston
testified that AAR’s damages were less than what had been in its disclosures, and
SCTW cross-examined him extensively on the issue of damages.
          In response, AAR argues that the trial court did not abuse its discretion in
allowing Bankston to testify as to his mental impressions because AAR’s disclosures
were adequate under the discovery rules, and because Bankston’s testimony regarding
certain documents that were created shortly before trial did not prejudice SCTW
because these documents were merely summaries of Bankston’s deposition testimony
and other previously disclosed damages information.

 

          A.      SCTW’s Pre-trial Motion to Exclude Any Expert Testimony

          Rule 194.2 requires disclosure of information regarding experts before trial,
provide adequate information about the experts’ opinions for the opposing party to
prepare to cross-examine the experts and to rebut the testimony with their own
experts. Taylor Foundry Co. v. Wichita Falls Grain Co., 51 S.W.3d 766, 773 (Tex.
App.—Fort Worth 2001, no pet.). For testifying experts, Rule 194.2(f) allows a party
to request disclosure of the expert’s name, address and telephone number; the subject
matter on which the expert will testify; the general substance of the expert’s mental
impressions and opinions and a brief summary of the basis for them; all documents,
tangible things, reports, models, or data compilations that have been provided to,
reviewed by, prepared by or for the experts in anticipation of the expert’s testimony; 
and the expert’s current resume and bibliography. Tex. R. Civ. P. 194.2(f). A party
is under a continuing duty to amend or supplement the response when it learns that
a response is no longer “complete and correct.” Tex. R. Civ. P. 193.5(a). Under
Texas Rule of Civil Procedure 193.6, an expert witness who is not timely identified
during discovery will not be permitted to testify unless the court finds good cause for
the proponent’s failure to timely identify the expert or finds that the opposing party
is not unfairly surprised or prejudiced by the expert’s testimony. In re Toyota Motor
Corp., 191 S.W.3d 498, 501 (Tex. App.—Waco 2006).
          We review a trial court’s decision to admit or exclude expert testimony for an
abuse of discretion. K-Mart Corp. v. Honeycutt, 24 S.W.3d 357, 360 (Tex. 2000). 
A trial court abuses its discretion when it rules on the admissibility of evidence in an
arbitrary or unreasonable manner or without reference to guiding legal principles or
rules. Carpenter v. Cimarron Hydrocarbons Corp., 98 S.W.3d 682, 687 (Tex. 2002).           The parties do not dispute that SCTW timely requested the information listed
in Rule 194.2(f) from AAR, or that AAR timely responded to those requests. 
SCTW’s arguments on this point instead relate to the adequacy of those responses. 
SCTW contends that the trial court should have granted its pre-trial motion to exclude
all of AAR’s proposed expert testimony because AAR’s discovery responses failed
to state the particular mental impressions and opinions of AAR’s expert witnesses,
the bases for their opinions, and AAR failed to attach documents or data compilations
that had been reviewed by, provided to or prepared by or for the experts in
anticipation of their trial testimony. Accordingly, SCTW sought to exclude any
expert testimony for AAR at trial on the grounds that AAR had failed to timely
disclose its expert opinions and had further failed to show any good cause or lack of
unfair surprise, as would be required under Texas Rule of Civil Procedure 193.6 for
expert opinions made past discovery deadlines to be admitted into evidence. 
          Here, the trial court did not abuse its discretion by failing to exclude
Bankston’s testimony as an expert regarding AAR’s damages. AAR’s pre-trial
discovery disclosures included a detailed listing—with dates, description and
amounts—of the outstanding invoices for which AAR sought payment, amounting
to approximately $ 309,703.19. AAR disclosed that Bankston was an officer of AAR
and had “knowledge commensurate with [his] position, including knowledge of
charges for the project made the basis of this suit, payments received by AAR, the
work performed and the usual and customary charges for the work performed on the
project made the basis of this suit.” In addition, AAR disclosed that Bankston would
testify as an expert witness and that he had “experience and training in mold and
environmental remediation.” AAR’s disclosures stated that it was Bankston’s opinion
that “the charges for [AAR’s] services . . . are usual, customary, reasonable and
necessary charges for work performed and that the work performed was reasonable
and necessary.” AAR also produced a copy of Bankston’s resume, which listed his
responsibilities as including “[e]stimating and finalizing estimates of other
estimators;” “[t]racking accounts payable and receivable;” and “[m]onitoring job
costs, productivity and manpower.” Bankston produced an expert report stating that
the charges AAR sought were reasonable, and pointed to his deposition testimony
regarding those amounts. Bankston again stated that his opinion regarding those
charges, for which SCTW had been invoiced, were based on his experience in the
industry. 
          We find AAR’s pre-trial disclosures gave SCTW ample notice of the
experience and data from which Bankston drew his opinions and the substance of
those opinions. In its motion to exclude and on appeal, SCTW argues that the
amounts Bankston stated are due to AAR do not reflect all of the credits and offsets
due to SCTW, and that Bankston’s opinions in the pretrial disclosures do not set out
all of the criteria by which the prices charges might be calculated—for example, the
motion notes that Bankston offers an opinion that the storage charges AAR sought
were reasonable, but did not provide a summary of the methodology by which such
rates might have been calculated. These arguments, however, do not go to the
adequacy of AAR’s disclosures regarding Bankston’s testimony on damages. 
Instead, SCTW’s arguments relate to the facts upon which SCTW might seek to
cross-examine Bankston at trial. The mere fact that an expert has not disclosed every
fact within his knowledge, or that his opinion or impression might be arguably
incorrect, is not grounds for finding disclosure of his opinion inadequate under Rule
194.2(f) or grounds for exclusion under Rule 193.6. The trial court did not abuse its
discretion in denying SCTW’s pre-trial motion to exclude Bankston. 
          B. SCTW’s Trial Objections to Bankston’s Testimony
          At trial, SCTW objected to Bankston’s testimony on the grounds that the basis
for his opinions had not been properly disclosed at least 30 days before trial and on
the grounds that Bankston testified using documents that had been prepared shortly
before trial. In addition, SCTW appears to have objected to any deviation between
the testimony Bankston gave at trial from what he offered in his deposition. 
          We must uphold a trial court’s evidentiary ruling if there is any legitimate basis
in the record to support it. Owens-Corning Fiberglass Corp. v. Malone, 972 S.W.2d
35, 43 (Tex. 1998); Taylor v. Tex. Dep’t of Protective & Regulatory Servs., 160
S.W.3d 641, 650 (Tex. App.—Austin 2005, pet. denied).
          In this case, Bankston’s damages testimony relied upon the contracts that
SCTW had signed, in particular the rates specified within those contracts, and the
invoices AAR and its subcontractor had forwarded to SCTW. Further, although
AAR’s final damages calculation at trial was different than the amount specified in
its pleadings and discovery, the amount sought at trial was less than what had been
previously stated. Although it points to Bankston’s admissions that the documents
from which he testified—summaries of various charges—had been prepared shortly
before trial, SCTW does not claim that it lacked the underlying documentation of
contracts and invoices about which Bankston testified, nor does it argue that it was
unfairly surprised by the amounts that AAR sought to recover.
          In our opinion in Branham v. Brown, this Court noted that 
[t]he general rule in Texas is that a party must make a full and complete
response to proper discovery requests, and this obligation includes the
duty to timely supplement discovery at least 30 days before trial. This
duty to supplement especially applies to information concerning expert
witnesses, and the trial court should exclude the testimony of an expert
witness when the duty to supplement has been violated. However, our
rules do not prevent experts from refining calculations and perfecting
reports through the time of trial. 

 925 S.W.2d 365, 370 (Tex. App.—Houston [1st Dist.] 1996, no writ) (citations
omitted). Further, “[c]aution must be taken in applying Rules 193.5(a) and 193.6 for
neither prevents an expert from refining his calculations and perfecting his report
through time of trial.” Koko Motel, Inc. v. Mayo, 91 S.W.3d 41, 50 (Tex.
App.—Amarillo 2002, pet. denied) (citing Exxon Corp. v. W. Tex. Gathering Co., 868
S.W.2d 299, 304 (Tex. 1993); Foust v. Estate of Walters, 21 S.W.3d 495, 504 (Tex.
App.—San Antonio 2000, pet. denied). 
          We find the analysis in Lubbock County v. Strube instructive. 953 S.W.2d 847
(Tex. App.—Austin 1997, pet. denied). In Strube, the expert made additional
calculations immediately before trial regarding the plaintiff’s damages. Id. Though
the percentage of diminished earning capacity factored into the equation by the expert
increased, the methodology or formula he used to derive the sums did not. And,
because it did not, the court held that Lubbock County had the requisite information
it needed to “attack [the expert’s] testimony . . . whatever the level of diminished
earning capacity.” Id. at 856. So, there were no “fundamental alterations that would
constitute a surprise attack” and necessitate supplementation. Id.; see W. Tex.
Gathering Co., 868 S.W.2d at 304 (stating that the duty to supplement requires that
opposing parties have sufficient information about an expert’s opinion to prepare a
rebuttal with their own experts). 
          Similarly, in Navistar International Transportation Corporation v. Crim Truck
& Tractor Company, the court refused to hold that the new opinions of Navistar’s
expert had to be excluded because the new opinions did not constitute a “material
change in [the expert’s] testimony” but rather evinced “an expansion on an already
disclosed subject.” 883 S.W.2d 687, 691 (Tex. App.—Texarkana 1994, writ denied).
          At trial, the following exchange occurred while counsel for AAR was
questioning Bankston: 
          [Counsel for AAR]:         Now, how much money is owed to AAR, Incorporated that you are asking this jury to
award?
 
          [Counsel for SCTW]:      Objection. That question violates a pre-trial
order. The answer certainly would. May we
approach?
 
          THE COURT:                 Yes.
 
          [Bench conference, on the record]
 
          [Counsel for SCTW]:      Your Honor, I believe [Counsel for AAR] is trying
to elicit answers from the witness which is going to
be something different from the last set of damages
figures in his request for disclosure which is
Defendant’s exhibit 8 . . . The amount of money in
their disclosures 30 days before trial is 309,703.19. 
I am pretty sure, although Mr. Koger was about to
say something totally different.
 
          THE COURT:                 Why?
 
          [Counsel for SCTW]:      Why? There was a conversation we had yesterday –
I’ll let him speak for himself.
 
          [Counsel for AAR]:         I am asking for less than what’s shown as the total
amount of damages.
 
          [Counsel for SCTW]:      You are asking for less than 309?
 
          [Counsel for AAR]:         Yes.
 
          THE COURT:                 What’s your problem?
 
          [Counsel for SCTW]:      My problem is they didn’t give us the exact
calculation up until the day of trial and all of a
sudden we are going to get calculations from them
that have never been provided before, so we can’t
really be prepared for cross examination.
 
          THE COURT:                 Overruled.

          This evidence to which SCTW objected were mathematical calculations and
summaries of charges stated in invoices sent to SCTW. Based on the record before
us, Bankston’s decision to testify to fewer rather than all of these charges, and AAR’s
decision to seek less than the damages it stated in its pleadings, did not diminish or
in any way impair SCTW’s ability to cross-examine Bankston on his testimony. If
anything, Bankston’s change in testimony provided SCTW an avenue by which to
impeach Bankston and impair his credibility before the jury. As stated above, SCTW
does not contend that it did not have these invoices or that it was unaware of the
charges that accrued over a period of several months. Accordingly, in this case, we
hold that the trial court did not abuse its discretion by allowing Bankston to testify
as to AAR’s damages, or in admitting the summaries he prepared of the numerous
invoices that AAR sent to SCTW. 
          C.      SCTW’s Havner Objection
          SCTW also complains that the trial court erred when it overruled its trial
objections to Bankston’s testimony regarding reasonableness and necessity of the
charges because “his testimony was not based on sufficient underlying facts or data,
making his opinions inadmissible TRE 702, 703 and 705, Merrell Dow
Pharmaceuticals v. Havner, 953 S.W.2d 549 (Tex. 1995).” In its appellate brief,
however, SCTW fails to explain which of Bankston’s particular statements it finds
violate the standards of scientific reliability as set forth in Havner and the cited Rules
of Evidence, nor does SCTW provide us with any citations to the record to support
this portion of its argument. Accordingly, this portion of the argument has been
waived. See Tex. R. App. P. 38.1(i) (an appellant’s brief must contain a clear and
concise argument for contentions made, with appropriate citations to authorities and
to record).
          We overrule SCTW’s first issue. 
II.      Did the trial court err by striking SCTW’s Cross-Claim against St. Paul?
          In its second issue, SCTW complains that the trial court erred by striking its
Cross-Claim against its insurer, St. Paul. St. Paul was already a co-defendant, having
been named in AAR’s original and supplemental petitions. In its Second Amended
Original Petition, filed August 22, 2006, AAR made claims for quantum meruit, fraud
and negligent misrepresentation against St. Paul based on its solicitation and
acceptance of work on the Bayou Pines facility, its failure to inform AAR that it
would not fully cover SCTW’s claimed losses, and its failure to inform AAR that it
had already disbursed “hundreds of thousands of dollars” under the insurance policy
to SCTW that it expected SCTW to pay to AAR. On September 27, 2006, St. Paul
answered with a general denial and by asserting the affirmative defense that others,
i.e., SCTW, were responsible for the acts upon which AAR based its suit. In a
Supplemental Petition filed October 5, 2006, AAR brought a breach of contract claim
against St. Paul based upon St. Paul’s failure to issue checks jointly to SCTW and
AAR, despite its promise to AAR that it would do so. For its part, SCTW had
answered the causes of action asserted against it in June 2006, asserting the
affirmative defense that AAR was estopped from seeking payment from SCTW
because AAR had allegedly agreed to seek payment from St. Paul. 
           SCTW filed an Original Cross-Claim against St. Paul on March 16, 2007, and
in this pleading SCTW alleged that it and St. Paul were parties to a binding
contract—the Rule 11 Agreement executed by St. Paul and SCTW during the
SCTW’s lawsuit against its contractors and architects, in which SCTW agreed it
would “address” the claims against it by AAR—and SCTW sought a declaratory
judgment from the trial court that this contract was ambiguous and therefore invalid. 
St. Paul filed a motion to strike this pleading, arguing that the issues raised, i.e.,
whether and to what extent SCTW had undertaken the obligation to pay AAR by
signing the Rule 11 Agreement with St. Paul, were already before the court by way
of AAR’s Third Amended Petition asserting that AAR was a third party beneficiary
to the Rule 11 Agreement between St. Paul and SCTW. St. Paul also alleged that
SCTW’s request that the clause at issue be stricken entirely from the agreement
and/or declared invalid was an improper remedy.   Declaratory relief is not available
to settle a dispute that is currently pending before a court. BHP Petroleum Co., Inc.
v. Millard, 800 S.W.2d 838, 841 (Tex. 1990) (orig. proceeding); Staff Ind., Inc. v.
Hallmark Contracting, Inc., 846 S.W.2d 542, 547-48 (Tex. App.—Corpus Christi
1993, no writ); John Chezik Buick v. Friendly Chevrolet, 749 S.W.2d 591, 594 (Tex.
App.—Dallas 1988, writ denied) (concluding that declaratory judgment counterclaim
was not properly brought because issue raised by defendant was already before court
as part of plaintiff’s case). 
          SCTW argues that the trial court improperly struck its Cross-Claim seeking a
declaratory judgment against St. Paul. On appeal, SCTW focuses its argument on the
issue of whether its Cross-Claim or AAR’s Third Amended Petition was the
document “first-filed” with the district court. SCTW ignores, however, the fact that
the issue at the heart of its Cross-Claim—whether and to what extent it assumed any
obligation to pay for AAR’s work by virtue of the Rule 11 Agreement with St.
Paul’s—was already at play in the pleadings filed by the parties. For example,
AAR’s claims against St. Paul included an allegation that St. Paul had committed
breach of contract and fraud and/or negligent misrepresentation by failing to inform
AAR that it would be SCTW’s responsibility, not St. Paul’s, to pay for the work AAR
performed. Further, St. Paul had answered AAR’s claims by asserting the affirmative
defense that others, i.e., SCTW, were responsible for the acts upon which AAR based
its suit. In other words, the meaning of the Rule 11 Agreement—what responsibility
was conferred upon SCTW when it agreed to “address” AAR’s “issues”—was already
before the trial court at the time SCTW filed its Cross-Claim seeking declaratory
relief as to that language. Accordingly, the trial court did not err by striking SCTW’s
Cross-Claim against St. Paul. We overrule SCTW’s second issue. 
III.    Were the jury’s findings in favor of AAR supported by legally and factual
sufficient evidence?

          SCTW challenges each of the jury’s findings against it, alleging that the jury’s
findings are not supported by legally or factually sufficient evidence. At the outset,
we note that SCTW challenges each of the jury’s findings in this case on the grounds
of legal and factual sufficiency. However, because the trial court’s judgment was
based on only upon the jury’s affirmative findings relating to AAR’s breach of
contract, fraudulent conveyance and conspiracy to fraudulently convey claims, we
review only those findings, plus the jury’s findings regarding attorney’s fees. 
 

          A.      Legal and Factual Sufficiency Standards of Review
          In reviewing the legal sufficiency of the evidence to support a jury’s finding,
“we consider whether the evidence at trial would enable reasonable and fair-minded
people to reach the verdict under review, crediting favorable evidence if reasonable
jurors could and disregarding contrary evidence unless reasonable jurors could not.”
Adams v. YMCA of San Antonio, 265 S.W.3d 915, 917 (Tex. 2008) (per curiam)
(citing City of Keller v. Wilson, 168 S.W.3d 802, 822, 827 (Tex. 2005)). “We
consider all of the evidence in the light most favorable to the verdict, and indulge
every reasonable inference that would support it.” Id. 
          When considering a factual sufficiency challenge to a jury’s verdict, we must
consider and weigh all of the evidence, not just that evidence which supports the
verdict. Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406–07 (Tex. 1998);
Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam). A verdict may only
be set aside if it is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust. Maritime Overseas Corp., 971 S.W.2d at 407; see also
Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). In conducting our
review of the factual sufficiency of the evidence, we are mindful that the jury, as
fact-finder, was the sole judge of the credibility of the witnesses and the weight to be
given their testimony. City of Keller, 168 S.W.3d at 819.           

          B.      Breach of Contract
          In its third issue, SCTW challenges the legal and factual sufficiency of the
jury’s finding that it breached a contract with AAR. The elements of a breach of
contract claim are: (1) the existence of a valid contract; (2) performance or tendered
performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages
sustained as a result of the breach. Valero Mktg. & Supply Co. v. Kalama Int’l,
L.L.C., 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.). 
          SCTW argues that the contracts at issue in this case were negotiated by St. Paul
and AAR, not between SCTW and AAR. Specifically, SCTW points to contract
language naming St. Paul, not SCTW, as the “payor” and contrary to testimony that
AAR representatives knew that St. Paul would review SCTW’s costs and would make
recommendations on the pricing. SCTW contends that the only evidence of any
agreement between SCTW and AAR is Steele’s verbal agreement that SCTW would
pay for climate control charges incurred from October 1, 2004 forward. SCTW
contends that there is no evidence that it similarly agreed to pay for any storage
charges from October 1, 2004 onward, and no evidence that it agreed to be
responsible for the entire amount of charges incurred between January 2004 and June
2006.  SCTW contends that the evidence mandates that we find the judgment on
AAR’s breach of contract claim to be supported by legally and factually insufficient
evidence. We disagree. 
          The jury was presented with evidence, in the form of contracts bearing the
signature of Stan Steele, SCTW’s Vice President, that SCTW accepted AAR’s
proposals to perform services on its behalf. These contracts were on SCTW’s own
letterhead. The services listed in the contracts included “Clean-up, Transportation,
Storage and Disposal of Misc Mold impacted building materials and furnishings” and
“Mold remediation.” While the documents, dated November 7, 2003 and March 3,
2004, do reference SCTW’s “understanding” that the work would be a covered loss
under its policy with St. Paul’s, SCTW’s acceptance of AAR’s work—and its
responsibility to pay for that work—is never made contingent upon that being the
case. In fact, the documents agree that “[u]pon acceptance of each segment of work,
Stan Steele will promptly process your payment.” In addition, although a signature
line appears for it, St. Paul did not sign the documents at issue. While SCTW
complains that it did not have an opportunity to negotiate the terms of the pricing
reflected in these contracts, it does not deny that Steele signed the contracts on its
behalf. Similarly, it does not contend that the language of these particular contracts
is ambiguous in any way. Nor does SCTW dispute that it accepted the services AAR
rendered. Finally, SCTW does not dispute that it failed to pay all of the invoices for
climate control and storage which were sent to it by AAR, which Bankston testified
amounted to $290,211.01. At trial, Wynell Suitt, SCTW’s President, testified she did
not know why SCTW did not pay AAR in full after receiving the October 26, 2005
demand. She agreed, however, that the obligations for the unpaid storage and climate
control services that SCTW received after October 1, 2004 were sums SCTW had
agreed to pay. 
          We therefore hold, after considering all of the evidence in the light most
favorable to the verdict, indulging every reasonable inference that would support the
verdict, that the evidence is legally sufficient to support the jury’s finding on AAR’s
breach of contract claim against SCTW. Similarly, considering and weighing all of
the evidence, not just that evidence which supports the verdict, we hold that the
evidence is factually sufficient to support the jury’s verdict on AAR’s breach of
contract claim against SCTW. We overrule SCTW’s third issue. 
          C.      Fraudulent Transfer of Assets 
          The jury charge included a question tracking the elements of the Texas
Uniform Fraudulent Transfer Act (“TUFTA”), as set out in Section 24.006 of Texas
Business and Commerce Code. The purpose of TUFTA is to prevent debtors from
defrauding creditors by placing assets beyond their reach. Tel. Equip. Network, Inc.
v. TA/Westchase Place, Ltd., 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.]
2002, no pet.). TUFTA provides remedies to creditors of debtors who fraudulently
transfer assets under certain circumstances. See Tex. Bus. & Com. Code Ann. 
§§ 24.005-.006, .008 (Vernon’s 2009). Section 24.006(a) states,
A transfer made or obligation incurred by a debtor is fraudulent as to a
creditor whose claim arose before the transfer was made or the
obligation was incurred if the debtor made the transfer or incurred the
obligation without receiving a reasonably equivalent value in exchange
for the transfer or obligation and the debtor was insolvent at that time or
the debtor became insolvent as a result of the transfer or obligation.

Id. § 24.006(a). Therefore, in order to prove that SCTW’s transfer to WTCS was
fraudulent under section 24.006(a), AAR was required to show (1) a claim against
SCTW arising prior to the transfer; (2) WTCS did not pay reasonably equivalent
value for the transfer; and (3) SCTW was insolvent at the time of the transfer or
became insolvent as a result of the transfer.
          SCTW argues that there was insufficient evidence to establish its “insolvency”
under the statute.


 SCTW contends that the only evidence in the record of its debts
or assets at the time of the transfer was that it was in default of a loan at the time of
trial but that no other evidence of its assets or obligations was presented. 
          Under TUFTA, a debtor is insolvent “if the sum of the debtor’s debts is greater
than all of the debtor's assets at a fair valuation” and “a debtor who is generally not
paying the debtor’s debts as they become due is presumed to be insolvent.” 
Id. § 24.003(a), (b). The jury charge contained instructions to this effect.  
          The jury heard evidence of at least two debts that SCTW acknowledged it owed
but had failed to pay—the loan payment of $43,000 per month that was three years
overdue at the time of trial, and the AAR payments which Wynell Suitt admitted
SCTW owed to AAR. In addition, the jury heard that SCTW’s sole source of income,
the Bayou Pines facility was “defunct” and in need of significant additional work
before residents could return to it, and that the residents of the Bayou Pines facility
had all been moved to another facility run by another corporate entity. Finally, the
jury heard that SCTW held a note from WTCS that was three years overdue and
which WTCS lacked the funds to pay, and that SCTW had transferred the funds it
received from its Contractor Lawsuit to WTCS despite the outstanding note and its
own outstanding loan and other debts. Considering all of the evidence in the light
most favorable to the verdict, indulging every reasonable inference that would
support the verdict, we hold that the evidence is legally sufficient to support the jury’s
verdict that SCTW fraudulently transferred assets to WTCS. Similarly, considering
and weighing all of the evidence, not just that evidence which supports the verdict,
we hold that the evidence is factually sufficient to support the jury’s verdict that
SCTW fraudulently transferred assets to WTCS. 
          D.      Civil Conspiracy
          The elements of civil conspiracy are (1) two or more persons; (2) an object to
be accomplished; (3) a meeting of minds on the object or course of action; (4) one
or more unlawful, overt acts; and (5) damages as the proximate result. See
Operation Rescue-Nat’l v. Planned Parenthood, 975 S.W.2d 546, 553 (Tex. 1998). 
The jury was asked to determine whether Stan Steele or Wynell Suitt were part of a
conspiracy to fraudulently transfer assets from SCTW.


 SCTW argues that there was
no evidence presented of any “object to be accomplished” by the transfer of its assets
to WTCS, and that the evidence is therefore insufficient to support the jury’s verdict.


 
          Conspiracy may be established by circumstantial evidence. See Lesikar v.
Rappeport, 33 S.W.3d 282, 302 (Tex. App.—Texarkana 2000, pet. denied). In this
case, the jury heard evidence that Wynell Suitt and Stan Steele were both officers of
SCTW and WTCS, and that they allowed SCTW to transfer over $500,000 of its
assets to WTCS after AAR filed suit against SCTW, even though SCTW was
insolvent at the time and had no ability to generate income for the foreseeable future,
and even though WTCS already owed over a million dollars on an unsecured note to
SCTW that it had failed to repay. In addition, the jury heard evidence of the close
interrelationships between Suitt, Steele, SCTW and WTCS, including the fact that
Suitt and Steele had each invested approximately one million dollars of their own
money in the Bayou Pines facility. Finally, the jury heard evidence that SCTW,
Steele and Suitt failed to reveal to AAR that SCTW had received a substantial amount
of money from St. Paul and from the Contractor Lawsuit and that SCTW had chosen
to transfer that money to WTCS rather than pay the invoices AAR had presented to
it. 
          While it is true that there was no evidence presented of a formal agreement
between Suitt and Steele regarding “an object to be accomplished,” the evidence at
trial is sufficient to support the jury’s finding that Steele and Suitt engaged in a
conspiracy to fraudulently transfer assets from SCTW to WTCS in spite of the fact
that SCTW owed money to both AAR and on its building loan. 
          We therefore hold, after considering all of the evidence in the light most
favorable to the verdict, indulging every reasonable inference that would support the
verdict, that the evidence is legally sufficient to support the jury’s verdict on AAR’s
civil conspiracy claim. Similarly, considering and weighing all of the evidence, not
just that evidence which supports the verdict, we hold that the evidence is factually
sufficient to support the jury’s verdict on AAR’s civil conspiracy claim. We overrule
SCTW’s sixth issue. 
          E.      AAR’s Attorney’s Fees
          SCTW contends that the award of attorney’s fees to AAR was improper
because AAR did not present sufficient evidence on any theory of liability that might
entitle AAR to recover its fees under Texas law. A party who recovers damages on
a breach of contract theory may, pursuant to statute, recover its attorney’s fees. Tex.
Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 2008). The jury question was
predicated upon the jury making an affirmative finding on any of several claims,
including breach of contract. Because we have held that the jury’s finding that
SCTW breached its contract with AAR was supported by legally and factually
sufficient evidence, we overrule SCTW’s eighth issue. 
Conclusion
          We overrule SCTW’s issues and affirm the trial court’s judgment below. 
 
 
George C. Hanks, Jr.
Justice

Panel consists of Chief Justice Radack, Justice Alcala and Justice Hanks.